**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 11-cr-00376-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

**1.     EXECUTIVE RECYCLING, INC.,
2.     BRANDON RICHTER, and
3.     TOR OLSON**,

      Defendants.

---

**ORDER ON DEFENDANTS' OBJECTIONS TO THEIR RESPECTIVE
PRESENTENCE INVESTIGATION REPORTS AND GOVERNMENT'S MOTION FOR
PRELIMINARY ORDER OF FORFEITURE**

---

On September 15, 2011, the Government filed a sixteen count Indictment against Defendants Executive Recycling, Inc., Brandon Richter, and Tor Olson. (ECF No. 1.) After a lengthy and hard fought jury trial, on December 21, 2012, Executive Recycling and Brandon Richter were convicted on nine counts, while Tor Olson was convicted on eight counts. (ECF Nos. 271-15, 271-16 & 271-17.) All Defendants were convicted of six counts of wire fraud, one count of mail fraud, and one count of smuggling. (*Id*.) Executive Recycling was convicted on one count of unlawful exportation of CRT monitors. (ECF No. 271-15.) Brandon Richter was convicted of one count of obstruction of justice. (ECF No. 271-16.)

The proceedings related to sentencing have been as hotly contested as the trial. After the jury returned its verdict, the parties all filed Sentencing Statements which

outlined their preliminary positions on the potential enhancements relevant to the charges of conviction.  (ECF Nos. 286, 297 & 298.)  After receiving these filings, the Court ordered additional briefing on certain particular issues raised therein, specifically the amount of loss and number of victims of the fraudulent scheme.  (ECF No. 301.)  The parties filed the requested briefs and Defendants obtained the services of an expert to assist the Court with its loss calculations.  (ECF Nos. 304, 310-11, 315, 336 & 337.)  After reviewing the briefs, the Court determined that an evidentiary hearing was necessary and such hearing was held on April 3, 2013.  (ECF No. 341.)

Additionally, at the Court's direction, the Probation Office prepared Presentence Investigation Reports ("PSIRs") for each Defendant.  (ECF Nos. 307, 308 & 312.)  Defendants and the Government filed objections to the PSIRs.  (ECF Nos. 317-19 & 345.)  The Government filed a Response to the Defendants' Objections.  (ECF No. 351.)  The Probation Office has prepared an Addendum to each PSIR with the Probation Officers' position on the parties' Objections.  (ECF Nos. 360-62.)

Defendants Richter and Olson have also filed Motions for Variant or Non-Guidelines Sentences.  (ECF Nos. 321 & 353.)  The Government has responded to those Motions.  (ECF Nos. 357-58.)

Finally, the Government has filed a Motion for Preliminary Orders of Forfeiture for Personal Money Judgments.  (ECF No. 350.)   Defendants have opposed this Motion.  (ECF Nos. 355-56.)

The purpose of this Order is to resolve most of the legal issues raised in the sentencing-related motions and briefing.  As set forth below, due to the lack of development of certain aspects of the record (which is admittedly difficult to believe

2

given the volume of paperwork filed by the parties in this case), the Court is forced to reserve ruling on a limited number of issues.  Additionally, this Order does not address Defendants' Motions for Variant or Non-Guidelines Sentences as these motions will be addressed at the Defendants' individualized sentencing hearings, which will be set by subsequent Court order.

## I.  LEGAL STANDARD

Federal Rule of Criminal Procedure 32(i)(3)(B) provides that a sentencing court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."  "The purpose of Rule 32 is 'to ensure that sentencing is based on reliable facts found by the court itself after deliberation.'" *United States v. Begay*, 117 F. App'x 682, 683 (10th Cir. 2004) (quoting *United States v. Nelson*, 356 F.3d 719, 722 (6th Cir. 2004)).  Therefore, a sentencing court does not satisfy its Rule 32 obligation by "simply adopting the presentence report as its finding."  *United States v. Guzman*, 318 F.3d 1191, 1198 n.9 (10th Cir. 2003).  Nonetheless, "[a] ruling on a disputed issue need not be exhaustively detailed, but it must be definite and clear."  *United States v. Williams*, 374 F.3d 941, 947 (10th Cir. 2004).

To the extent other legal standards apply to various aspects of this Order, the Court will discuss those standards in the relevant context below.

## II.  ANALYSIS

The Court will first determine the amount of loss for purposes of § 2B1.1(b)(1),

which was the subject of extensive briefing and the majority of the post-trial evidentiary hearing.  Following this analysis, the Court will address restitution and forfeiture. Finally, the Court will discuss each of the parties' discrete objections to enhancements applied or rejected in the PSIRs, as well as factual statements made in the PSIRs and relied on by the Probation Officers in making their sentencing recommendation.

**A.    Amount of Loss Pursuant to U.S.S.G. § 2B1.1(b)(1)**

Section 2B1.1 of the United States Sentencing Guidelines guides a court when sentencing a defendant for "Larceny, Embezzlement, and other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States."  Part of a court's duty when sentencing under § 2B1.1 is to determine whether a defendant's base offense level should be increased because of the amount of loss the offense caused.  *See* U.S. Sentencing Guidelines Manual (hereafter "U.S.S.G.") § 2B1.1(b)(1) ("If the loss exceeded $5,000, increase the offense level as follows. . . .").

The application notes to § 2B1.1 define loss as "the greater of actual or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id*. at cmt. n.3(A)(i).  "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense." *Id*. at cmt. n.3(A)(ii).  "Pecuniary harm" means "harm that is monetary or that otherwise is readily measurable in money." *Id*. at cmt. n.3(A)(iii).

In this case, the parties strenuously dispute the amount of loss for purposes of §

4

2B1.1(b)(1).  The PSIRs have a loss amount of $403,790.22, which results in a fourteen level enhancement.  (ECF Nos. 307-08 & 312.)  The Government contends that the loss should be valued as all monies paid by the customers named in the Indictment, as well as Summit County, for a total of $475,293.32.  (ECF No. 286 at 10.)  Defendants provide a variety of ways to value the loss, with the result ranging from no actual loss to a maximum of $195,000, the total amount paid by the customers named in the counts of the Indictment on which they were convicted.  (ECF Nos. 297-98; 310-11.)

      1.    <u>Relevant Conduct</u>

An important aspect of the loss calculation that is disputed by the parties is which customers' payments to Defendants should be included in the loss calculation.  The PSIRs include losses incurred by the following customers: City of Broomfield, El Paso County, City of Boulder, Jefferson County, Denver Newspaper Agency, ADT, and Summit County.  (ECF Nos. 307-08 & 312.)  Defendants object to the inclusion of ADT and Summit County because they were not convicted on any offense specifically involving these customers.  (ECF Nos. 318-19.)  The Government objects to the PSIRs' failure to include Centura Health, Children's Hospital, and Cherry Creek Schools because, although Defendants were acquitted on the counts of the Indictment naming these entities, the Government believes Defendants' actions as to them still fall within the relevant conduct to be considered.  (ECF Nos. 345.)

"In calculating loss under the Guidelines, the district court does not limit itself to conduct underlying the offense of conviction, but rather may consider all of the defendant's relevant conduct."  *United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009) (internal quotation marks omitted).  Section 1B1.3 sets the standard for "Relevant

Conduct" as follows:

> **(a) Chapters Two (Offense Conduct) and Three (Adjustments).**  Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
>
> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4) any other information specified in the applicable guideline.

The Guidelines Commentary further explains:

> For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar

6

> modus operandi. . . .
>
> . . . .  Offenses that do not qualify as part of a common
> scheme or plan may nonetheless qualify as part of the same
> course of conduct if they are sufficiently connected or
> related to each other as to warrant the conclusion that they
> are part of a single episode, spree, or ongoing series of
> offenses.

*Id.* § 1B1.3, cmt. n.9.  The Tenth Circuit has interpreted this language to mean that "if

the conduct is sufficiently similar and within the same temporal proximity, it may be

considered relevant for purposes of determining the guideline range."  *United States v.*

*Williams*, 292 F.3d 681, 685 (10th Cir. 2002).  Relevant conduct under the Guidelines

thus "comprises more, often much more, than the offense of conviction itself, and may

include uncharged and even acquitted conduct." *United States v. Altamirano-Quintero*,

511 F.3d 1087, 1095 (10th Cir. 2007).  Nonetheless, relevant conduct "still must relate

to the offense of conviction."  *Id.*  In addition to being related to the convicted conduct,

the relevant conduct must separately constitute a criminal offense under either a federal

or state statute.  *Griffith*, 584 F.3d at 1013.

a.      *Government's Objection*

The Government objects to the PSIRs' failure to include the losses suffered by

Centura Health, Cherry Creek Schools, and Children's Hospital.  (ECF No. 345 at 1.)

The Court previously ruled that these entities would not be included in the loss

calculation because Defendants were acquitted on the counts of the Indictment that

specifically named these entities.  (ECF No. 301 at 2-3.)  The Court incorporates its

prior reasoning here.  The Court acknowledges that it has the discretion to consider

these entities as victims for purposes of the amount of loss.  *United States v. Watts*,

519 U.S. 148, 154 (1997).  However, the Court finds that, even under the less demanding preponderance of the evidence standard, the Government failed to present sufficient evidence at trial to permit the Court to conclude that Defendants' actions towards Centura Health, Cherry Creek Schools, and Children's Hospital constituted a criminal offense under a federal or state statute.  *See United States v. Kieffer*, 681 F.3d 1143, 1168 (10th Cir. 2012).

Accordingly, the Government's objection to the failure to include in the loss calculation the amounts paid to Defendants by Centura Health, Cherry Creek Schools, and Children's Hospital is OVERRULED.

### b.    *Defendants' Objections*

Defendants object to the inclusion of ADT and Summit County in the loss calculation because they were not named in any of the Counts of the Indictment on which Defendants were convicted.  (ECF Nos. 317, 318 & 319.)  The Government contends that the monies paid by ADT and Summit County are properly included in the loss calculation as relevant conduct.  (ECF No. 304 at 15-20.)

Based on the evidence presented at trial and at the post-trial hearing, there is no dispute that Defendants' actions towards ADT and Summit County are closely related to the fraud offenses on which Defendants were convicted.  Defendants' website and their representations made therein were the same when the website was accessed by ADT and Summit County as when it was utilized by the City of Boulder or the City and County of Broomfield.  Additionally, the types of solicitations Defendants made towards ADT and Summit County were not materially different from those they made to Jefferson County or El Paso County.  Thus, the key finding for relevant conduct

purposes is whether Defendants' actions towards ADT and Summit County violated any federal or state statute. *Griffith*, 584 F.3d at 1013.

i.     ADT

Ron Goodchild testified at trial that ADT's requirements for doing business with an electronics recycler were that the recycler was "EPA certified and a slew of other things". Mr. Goodchild believed Executive Recycling met "those requirements" and, therefore, he agreed to do business with Defendants. Mr. Goodchild testified that ADT would not have done business with Executive Recycling if Mr. Goodchild had known that Defendants were not handling ADT's electronic waste "in the manner represented." At the post-trial evidentiary hearing on the amount of loss, the Government offered into evidence an e-mail sent to ADT by an employee of Executive Recycling that generally described Executive Recycling's business practices. (Gov't Ex. 21.)

The Court finds that there is insufficient evidence on the issue of whether any misrepresentation to ADT was material to that entity's decision to contract with Defendants. Mr. Goodchild's testimony about what characteristics were important to ADT in choosing to do business with Executive Recycling was vague. ADT's requirement that any electronics recycler be "EPA certified" was an impossible prerequisite, as the evidence at trial showed that the EPA does not, in fact, "certify" electronics recyclers. The only other testimony on this subject was that ADT required a "slew of other things" before it would agree to do business with an electronics recycler. Without any specifics as to what was important to ADT, the Court cannot determine whether Defendants made any misrepresentation to ADT that was material to its decision to do business with Executive Recycling.

9

The Government contends that it does not have to link a specific misrepresentation to each victim and that the Court can rely on the fact that Defendants were convicted of a "scheme to defraud".  (ECF No. 304 at 16.)  In the context of the jury's verdict in this case, the Court disagrees.  Had the jury believed that Defendants' overall business model was criminal, Defendants would have been found guilty on all of the fraud counts.  The fact that the jury only convicted Defendants on half of the fraud counts shows that it carefully considered the evidence related to each Count and the customer named in that Count and, in the process, clearly determined that the Government's evidence was adequate with respect to some customers, and lacking with regard to others.

The evidence of misrepresentations made to each customer was relatively consistent; the customers were all generally promised that Executive Recycling complied with all laws and regulations, did not export materials, destroyed data as requested, etc.  However, the customers' testimony differed significantly when it came to the bases on which the customers made the decision to do business with Executive Recycling.  For example, the City of Boulder's representative testified that the most important feature to Boulder in choosing an electronics recycler was that no equipment could be exported anywhere, even to Canada.  (ECF No. 323 at 26-27.)  On the other hand, the representative for Children's Hospital testified that the most important aspect to Children's decision to do business with Defendants was their industrial hard drive shredder, because its main concern was data security and patient privacy.  (ECF No. 328 at 8-9.)  Given the evidence showing that hard drives were routinely shredded at Defendants' local facility while CRT monitors were routinely exported overseas, it came

10

as no surprise to the Court that Defendants were convicted on the Count of the

Indictment which named the City of Boulder as a victim (Count 10) and acquitted on the

Count naming Children's Hospital (Count 6).  (ECF Nos. 271-15, 271-16, & 271-17.)

The mixed nature of the jury's verdict shows that, in deciding whether to convict

Defendants on a particular count of the Indictment, the jurors focused on how the

misrepresentations made by Defendants affected each customers' decision to do

business with Executive Recycling.  With this understanding of the verdict as the

backdrop, the Court finds the Government has not met its burden of showing that

Defendants' dealings with at ADT included false or fraudulent pretenses,

representations, or promises that were material.  Because the Government has not met

its burden of showing that Defendants' conduct towards ADT violated any state or

federal statute, the Court will not consider the amounts paid to Defendants by ADT as

relevant conduct in its loss calculation.  *See Griffith*, 584 F.3d at 1013.  Accordingly,

Defendants' objections to the inclusion of the monies paid by ADT are SUSTAINED.

ii.    Summit County

At the Court's post-trial hearing on the amount of loss, the Government called

Kevin Berg to testify on behalf of Summit County.  Mr. Berg testified that, in choosing a

company to contract with for electronic recycling services, one of the most important

considerations for Summit County was whether the company would handle the

materials domestically.  An e-mail between Mr. Berg and Defendant Richter admitted

into evidence showed that the importance of domestic recycling was conveyed to

Defendants at the time they started doing business with Summit County.  In the e-mail,

Mr. Berg directly asked Defendant Richter whether any of Summit County's materials

would be shipped overseas and informed Defendant Richter that Summit County "may

not be interested" in doing business with Executive Recycling if the answer were yes.

In his testimony at the hearing, Mr. Berg clarified that Summit County would not have

been interested in doing business with Executive Recycling if it had known that

Executive Recycling was shipping <u>anything</u> overseas, regardless of whether the

electronic materials being exported came from Summit County.  Mr. Berg testified that,

in response to this e-mail, Defendant Richter called and assured him that no materials

were going overseas, and that all of Summit County's electronic materials would be

handled domestically.

Based on this record, the Court finds by preponderance of the evidence that

Defendants' action towards Summit County constituted criminal conduct.  The

misrepresentations about all electronic materials being handled domestically were

material to Summit County's decision to do business with Executive Recycling.  The

Court finds that these representations were false given the evidence showing that

Executive Recycling routinely exported electronic materials received from customers.

Moreover, the Court finds that the misrepresentations were specifically intended to

procure Summit County's business and that Defendants used interstate wire

communications facilities to carry out the fraudulent scheme.  Finally, the Court finds

that the fraudulent scheme used to solicit Summit County's business was similar to that

used against the victims in the offenses of conviction, such as the City of Boulder.

Therefore, the Court finds that the Government has met its burden of showing

that Defendants' fraudulent conduct towards Summit County qualifies as relevant

conduct for purposes of the loss calculation in § 2B1.1(b)(1).  Defendants' objections to

the inclusion of the monies paid to Executive Recycling by Summit County are OVERRULED.

### iii.     Other Customers From Post-Trial Hearing

At the Court's post-trial evidentiary hearing on the amount of loss, the Government introduced into evidence e-mails exchanged by Defendants and a number of other customers.  (Gov't Exs. 522-531.)  Specifically, the Government introduced e-mails about business dealings between Defendants and Denver Water, Janus, Learning Services, Lowry Glory Days, Millenium Recycling, and the Rose Community Foundation.  (*Id.*)

The purpose of these e-mails has not been explained in any subsequent filing. However, the Court presumes that these e-mails were admitted to attempt to show that these other entities were also victims of the fraud and, therefore, the amounts paid by these victims should be included in the amount of loss, which would also result in these entities being considered victims for purposes of restitution and § 2B1.1(b)(2)'s enhancement based on the number of victims.

In the Court's view, the same reasoning set forth above with respect to ADT applies to these entities.  That is, the Court finds that there is not sufficient evidence in the record to permit it to find that Defendants' misrepresentations about Executive Recycling's business practices were material to any of these entities.  The e-mails admitted into evidence show that Defendants made misrepresentations about how certain materials would be handled and where materials would end up, but there is no evidence that these misrepresentations influenced the customers' decisions to do business with Defendants.  As the Court has previously noted, it cannot find that

13

Defendants' actions towards these customers constituted relevant conduct if these actions on the part of Defendants were not criminal.  In the absence of evidence showing that Defendants' misrepresentations were material, Defendants did not engage in criminal activity.  Accordingly, the Court finds that Defendants' business dealings with Denver Water, Janus, Learning Services, Lowry Glory Days, Millenium Recycling, and Rose Community Foundation are not relevant conduct.

> c.      *Conclusion*

For the remainder of the issues to be addressed at sentencing, the Court will consider as relevant conduct only Defendants' actions towards Summit County.

> 2.      Amount of Loss

"The purpose of the loss calculation under the Sentencing Guidelines is to measure the magnitude of the crime at the time it was committed."  *United States v. Schild*, 269 F.3d 1198, 1201 (10th Cir. 2001).  When the loss amount is disputed, as it is in this case, the Government bears the burden of establishing "the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence."  *Kieffer*, 681 F.3d at 1168 (*citing United States v. Peterson*, 312 F.3d 1300, 1302 (10th Cir. 2002)).  The Court is not required to calculate the loss with specificity; rather, "[t]he court need only make a reasonable estimate of the loss, given the information available."  *Untied States v. Masek*, 588 F.3d 1283, 1287 (10th Cir. 2009).  The Sentencing Guidelines neither proscribe, nor prohibit, a methodology for a court to use when calculating the "reasonable estimate" of the loss a defendant's conduct caused.  *See United States v. Erpenbeck*, 532 F.3d 423, 433 (6th Cir. 2008).

The PSIRs include as the amount of loss the entire amounts paid to Executive Recycling by Jefferson County, El Paso County, Denver Newspaper Agency, City and County of Broomfield, City of Boulder, and Summit County (collectively "Victims").[1] (ECF Nos. 317, 318 & 319.)  These amounts are as follows:

| Victim | Amount Paid |
|---|---|
| Jefferson County | 126,023.99 |
| El Paso County | 23,761.89 |
| Denver Newspaper Agency | 40,625.17 |
| City and County of Broomfield | 1,835.00 |
| City of Boulder | 3,590.66 |
| Summit County | 17,937.60 |

Defendants object on a variety of grounds to these amounts as the proper measure of the loss in this case.  Each of the Defendants' arguments will be addressed in turn below.

      a.    *No pecuniary harm*

Defendants first contend that there was no pecuniary harm to the Victims in this case because the electronic materials they handled had no value or a negative value to the Victims.  (ECF No. 298 at 17.)  Defendants contend that state and federal laws required the Victims to contract with an electronics recycler to dispose of their used electronic materials and Executive Recycling was typically the cheapest option for e-waste recycling.  (*Id*. at 17-18.)  Therefore, had the Victims not contracted with

---

[1]  The PSIRs also include the monies paid by ADT.  However, for the reasons discussed above, the Court has found that Government has not met its burden of showing that Defendants' actions towards ADT were relevant conduct.  Therefore, the Court does not include the monies paid by ADT in its loss calculation.

Defendants, they would have actually had to spend more money to contract with someone else.  (*Id*.; ECF No. 310 at 10-12.)

The Government argues that the amount of loss should be all of the monies paid by the victims to Defendants because "[a]ll of the victims testified that they would not have paid defendants to take their business if they had known what the defendants were actually doing with the e-waste."  (ECF No. 304 at 6.)  The Government contends that the Victims "relied on defendants' misrepresentations in deciding to use them, and therefore money paid stems directly from defendants' fraud."  (*Id*.)

The Court agrees with the Government on this point.  The fact that the Victims likely would have hired a different company to dispose of their electronic materials does not negate the harm they suffered by choosing to hire Defendants.  Per Application Note 3 to § 2B1.1, the Court must calculate the reasonably foreseeable pecuniary harm that resulted from the fraudulent conduct.  The evidence at trial showed that the Victims would not have done business with Defendants if they had known the CRTs they sent for recycling were being shipped overseas.  Had Defendants not falsely stated that they were processing the CRTs domestically, the Victims would not have contracted with Executive Recycling and would not have paid <u>any</u> money to Executive Recycling. Therefore, the Court finds that the money paid to Defendants by the Victims was the reasonably foreseeable pecuniary harm resulting directly from the fraud, and therefore constitutes the "loss" for purposes of § 2B1.1(b)(1).

> b.    *No intended loss*

Defendants also argue that there was no intended loss because they testified at trial that they were trying to save their customers money by offering their services for

the lowest possible price.  (ECF No. 310 at 13.)  However, Defendants' intent with respect to causing a loss is immaterial because there was actual loss in this case.  *See* U.S.S.G. § 2B1.1, cmt. n.3(A) ("loss" for purposes of § 2B1.1(b)(1) is "the greater of actual or intended loss.").  As the Court previously stated, the evidence showed that the Victims would not have done business with Executive Recycling if they had known that their CRTs were being shipped overseas.  Because the money the Victims paid to Executive Recycling to dispose of those CRTs was an <u>actual</u> loss caused by the fraudulent conduct, the fact that Defendants may not have intended any loss is immaterial.

c.     *Offset for value of legitimate services provided*

Defendants also object to the PSIRs' failure to apply Application Note 3(E)(i) to § 2B1.1, which requires an offset to the amount of loss in the value of the legitimate services provided.  (ECF No. 311 at 13-14.)

Application Note 3(E)(i) states:

> **(E) Credits Against Loss.**–Loss shall be reduced by the following:
>
> (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.  The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

The Government disputes the applicability of this provision.  It first contends that Application Note 3(E)(i) does not apply because Application Note 3(F)(v) provides that

17

there shall be no credit for the value of services provided by a scheme in which: "(I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained."

The Government argues that this case falls under subsection I in that Defendants represented to customers that they were "EPA certified" and witnesses testified that there is no such certification issued by the EPA.  (ECF No. 304 at 9.) Defendants contend that subsection I is not satisfied because it is intended to be narrowly applied only to individuals that posed as attorneys and medical personnel, and is not intended to cover electronics recycling companies.  (ECF No. 311 at 14; ECF No. 310 at 15-16.)

When adopting this provision, the Sentencing Commission stated:

> The definition of "loss" also provides special rules for certain schemes.  One rule includes in loss (and excludes from crediting) the benefits received by victims of persons fraudulently providing professional services.  This rule reverses case law that has allowed crediting (or exclusion from loss) in cases in which services were provided by persons posing as attorneys and medical personnel.  *See United States v. Maurello*, 76 F.3d 1304 (3d Cir. 1996) (calculating loss by subtracting the value of satisfactory legal services from amount of fees paid to a person posing as a lawyer); and *United States v. Reddeck*, 22 F.3d 1504 (10th Cir. 1994) (reducing loss by the value of education received from a sham university).  The Commission determined that the seriousness of these offenses and the culpability of these offenders is best reflected by a loss determination that does not credit the value of the unlicensed benefits provided.  In addition, this provision eliminates the additional burden that would be imposed on courts if required to determine the value of these benefits.

18

66 F.R. 30512-01, 30544 (June 6, 2001).

The Court finds that the Sentencing Commission's comments indicate that subsection I should only apply to industries in which there are licensing schemes, such as lawyers, doctors, accountants, and universities.  At trial, there was evidence that the EPA did not "certify" electronics recyclers and, therefore, Defendants were not operating in an industry where licensing was expected (or even possible).  In *United States v. Allen*, 529 F.3d 390, 397 (7th Cir. 2008), the Seventh Circuit affirmed the district court's refusal to apply Application Note 3(F)(v) to a microbiologist that held himself out as a certified mold inspector.  The Court noted that the defendant "was holding himself out as a highly qualified expert, but the profession in which he was scheming was not a licensed one" so "there was no license that he could have pretended to possess."  *Id*.  The same is true here.

Moreover, there was also evidence at trial that Executive Recycling was registered with the State of Colorado as a large quantity handler of universal waste and had an EPA identification number.  Therefore, it appears Defendants had all of the "certifications" that were available in their industry.  Rather than being "unlicensed", Defendants were actually just improperly doing the job that they were "licensed" (to the extent possible in the electronics recycling industry) to do.

The Government fails to cite any case law applying subsection I of this Comment in a case such as this.  Considering the text and legislative history of Application Note 3(F)(v)(I) and the case law interpreting and applying it, the Court finds that Application Note 3(F)(v)(I) does not apply here.

The Government also attempts to shoehorn this case into subsection III because

Defendants were required to get authorization from the regulating authorities before exporting the CRT monitors, and no authorization was ever obtained.  However, as Defendants point out, this provision applies only to the sale of "goods" and it is undisputed that the fraud in this case related to the manner in which electronics were recycled, which is a "service".  Therefore, the Court agrees with Defendants and finds that Application Note 3(F)(v)(III) also does not apply here.

The Government next contends that there should be no offset under Application Note 3(E)(i) because Defendants did not provide any legitimate services that had value to the Victims.  (ECF No. 304 at 8-9.)  With respect to handling of the CRT monitors, the Court agrees with the Government.  The Victims universally testified that, had they known their CRTs would end up overseas, they would not have paid any money to Defendants for this service.  Thus, the Court finds that the manner in which the Defendants disposed of the CRT monitors was so contrary to the way the Victims wanted the CRT monitors handled that those services had no value to the Victims.  As such, the Court will not offset the amount of loss by the money the Victims paid to Defendants for anything to do with removal and handling of the CRT monitors.

However, the Court finds that the other services provided by Defendants—data destruction, hard drive shredding, and equipment decommissioning and resale—had a legitimate market value in general and to the Victims.  Though there was evidence that one laptop computer was resold without the hard drive having been wiped, this appears to have been an oversight or an isolated error.  The overwhelming evidence at trial showed that, other than the CRT handling and disposal, Defendants provided the services which the Victims contracted for in the manner contemplated by the parties'

20

agreements.

The Court therefore finds that, pursuant to Application Note 3(E)(i), Defendants are entitled to an offset for the fair market value of the legitimate services they provided, which includes all services except for the CRT removal, handling, and disposal.  *See United States v. Anders*, 333 F. App'x 950, 955 (6th Cir. 2009) (district court must apply offset to amount of loss when defendant provided legitimate services related to the fraud).  Accordingly, Defendants' objections to the PSIRs' failure to offset the amount of loss by the value of the legitimate services rendered are OVERRULED to the extent they seek an offset for the value of CRT removal, handling, and disposal, and SUSTAINED to the extent they seek an offset for the value of all other services provided.

d.   *Calculation of the Amount of Loss*

Although the Government has the burden of proving the amount of loss, Defendants have the burden of proving that they are entitled to a credit against the loss amount.  *See United States v. Hammer*, 3 F.3d 266, 272 (8th Cir. 1993) ("The burden of proof [at sentencing] is on the government with respect to the base offense level and any enhancing factors.  The burden of proof is on the defendant with respect to mitigating factors."); *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990) ("[T]he government should bear the burden of proof when it seeks to raise the offense level and . . . the defendant should bear the burden of proof when the defendant seeks to lower the offense level."); *see also United States v. Felix*, 561 F.3d 1036, 1043-44 (9th Cir. 2009) (quoting *Howard*).

21

To meet this burden, Defendants retained the services of Seigneur Gustafson LLP, which prepared a "Report of Economic Loss Analysis" ("Expert Report").  (ECF No. 311-1.)  At the Court's post-trial hearing on the amount of loss, Defendants presented testimony from Ronald Seigneur, one of the certified public accountants who prepared the Expert Report, and the Expert Report was admitted into evidence.  The purpose of the Expert Report was to "identif[y] the services rendered by [Executive Recycling] to each of the customers[2] and to isolate the services that specifically relate to the obsolete CRT monitors, as opposed to the handling and destruction of hard drives and other computer equipment and peripheral equipment."  (ECF No. 311-1 at 7.)  The Expert Report notes that its calculations, for the most part, are estimates because Defendants' "dock logs" and invoices were oftentimes not detailed or specific enough to allow for precise calculations.  Many of the invoices did not separate the charges for handling and processing CRT monitors from the charges associated with the other services.  For many customers, Defendants did not invoice the inbound equipment by type and number of component elements.  Rather, many customers simply paid a price per pound for processing, regardless of whether the service provided was data destruction, hard drive shredding, or CRT monitor disposal.  (*Id*. at 10.)

The Government also presented evidence, both at trial and at the Court's post-trial hearing, that is relevant to the calculation of the amount of loss.  First, the Government provided evidence showing the total amount paid by each Victim to the

---

[2]  The Expert Report includes all of the Victims, as well as ADT.  Because the Court has found that the Government did not meet its burden of showing that the conduct towards ADT was relevant conduct, the Court will not discuss the portion of the Expert Report that pertains to ADT.

Defendants, which are set forth in the chart above and adopted by the PSIRs.  The

Government also provided a chart showing the number of CRT monitors sent to

Defendants for processing by each Victim.  Finally, the Government introduced a

summary chart showing the Victims' payments to Defendants, whether the Victims were

billed by Defendants on a per item or per pound basis, and the number of invoices for

each Victim found on Defendants' computer systems.

In fashioning the amount of loss for each Victim, the Court has relied on the

Government's evidence, the Expert Report (which incorporates and relies on much of

the Government's evidence), and the testimony at the hearing on the amount of loss.

The Court acknowledges that the losses calculated below are not precise.  However,

the case law is clear that the Court may, based on the evidence available to it, make a

reasonable estimate of the value of legitimate services provided by the defendant for

purposes of an offset to the amount of loss.[3]  *United States v. Snow*, 663 F.3d 1156,

1161 (10th Cir. 2011); *United States v. James*, 592 F.3d 1109, 1116 (10th Cir. 2010).

The Court's analysis of the actual loss suffered by each Victim is discussed below.

i.    Jefferson County

Mr. Seigneur testified that Jefferson County is the only Victim for which there are

specific and detailed invoices that included the particular number and types of items

_____

[3]  In the alternative, the Government contends that the Court could sentence Defendants using gain as a reasonable approximation of loss.  (ECF No. 304 at 10.)  However, the Court may use gain only if it finds that, while the victims suffered a loss, there is no reasonable way for the Court to determine the amount of such loss.  *United States v. Galloway*, 509 F.3d 1246, 1252 (10th Cir. 2008).  Thus, before turning to gain as an estimation of the amount of loss, the Court must first find that there is no reasonable way to determine the amount of loss.  *Id.* Because, as set forth below, the Court has arrived at a reasonable estimate of the amount of loss, the Court finds that use of the gain to Defendants is not appropriate in this case.

handled by Defendants.  These invoices broke down the amount paid by Jefferson County for the various services and show that Jefferson County paid $57,748 for CRT monitor disposal.  (ECF No. 311-1, ex. C.)   The total amount paid by Jefferson County was $126,024.  (*Id*.)  Therefore, the value of the legitimate services provided by Defendants to Jefferson County is $68,276 ($126,024 - $57,748 = $68,276).  Offsetting the amount paid to Executive Recycling by Jefferson County by the fair market value of the legitimate services provided results in an actual loss to Jefferson County of $57,748.

### ii.      City of Boulder

Defendants handled 413 CRT monitors for the City of Boulder and paid $5 per CRT monitor for handling and disposal.  (ECF No. 311-1 at 20.)  Therefore, the Court finds that the City of Boulder's costs associated with CRT monitor disposal was $2,065 (413 monitors x $5 per monitor).  The City of Boulder paid Executive Recycling a total of $3,591.  (*Id*.)  Thus, the value of the legitimate services provided to the City of Boulder was $1,526 ($3,591 - $2,065 = $1,526) and the actual loss to the City of Boulder for purposes of § 2B1.1(b)(1) is $2,065.

### iii.      El Paso County

El Paso County paid Defendants a total of $23,762 for all services and paid for these services on a per pound basis.  El Paso County's invoices did not detail the types of items handled by Defendants but the Expert Report shows that Defendants handled a total of 4,674 items on behalf of El Paso County.  1,573 of these (approximately 34%) were CRT monitors.

Because El Paso County paid on a per pound basis, there is no reason to

24

believe that the cost per pound for handling and processing a CRT monitor was any different than the cost per pound for shredding a hard drive or decommissioning a desktop computer.  Therefore, a reasonable estimate of the amount paid by El Paso County for the handling and processing of CRT monitors is the total amount paid for all services multiplied by the percentage of the total items that were CRTs.  Multiplying $23,762 by 34% shows that El Paso County paid approximately $8,079 for CRT handling and processing.  Therefore, the value of the legitimate services received by El Paso County was $15,683 ($23,762 - $8,079 = $15,683) and the actual loss to El Paso County from the fraudulent conduct was $8,079.

iv.      Summit County

Like El Paso County, Summit County was billed on a per pound basis. Therefore, the Court will employ the same methodology used with El Paso County in calculating Summit County's actual loss.

Defendants handled 1,865 items for Summit County, 589 (or 32%) of which were CRT monitors.  (ECF No. 311-1 at 20.)  Multiplying the total amount paid by Summit County ($17,938) by 32% shows that Summit County paid approximately $5,740 for the handling and processing of CRT monitors.  Thus, the value of the legitimate services provided by Defendants to Summit County was $12,198 ($17,938 - $5,740 = $12,198). The actual loss to Summit County from the fraudulent conduct was $5,740.

v.      City and County of Broomfield

The City of and County of Broomfield paid Defendants $1,835 for all services. The Govenment's summary chart shows that the City and County of Broomfield was billed on a per item basis, but there was no evidence introduced at trial or at the post-

25

trial hearing as to the rate it paid for each CRT monitor.  Therefore, the Court cannot use the methodology applied to the City of Boulder and will instead use the same formula used for El Paso County and Summit County to estimate the City and County of Broomfield's actual loss.

Defendants handled 483 items for the City and County of Broomfield, 170 (approximately 35%) of which were CRT monitors.  (ECF No. 311-1 at 20.)  Multiplying $1,835 (the total amount paid by the City and County of Broomfield) by 35% shows that the City and County of Broomfield paid Defendants $642 for the handling and processing of its CRT monitors.  Thus, the value of the legitimate services provided to the City and County of Broomfield was $1,211 ( $1,835 - $642 = $1,211) and its actual loss was $642.

vi.    Denver Newspaper Agency

Denver Newspaper Agency paid Executive Recycling on a per pound basis. Therefore, the Court will apply the same methodology used with El Paso County and Summit County.  However, for Denver Newspaper Agency, the Court will not simply rely, as it has done for the other Victims, on the percentage of CRT monitors to total items as calculated in the Expert Report.  The Expert Report states that only 16% of the items handled by Defendants for Denver Newspaper Agency were CRT monitors. (ECF No. 311-1 at 20.)  The Court finds that this number is unreliable.

 The basis for the Court's finding is that Mr. Seigneur's testimony at the post-trial hearing was that the invoices for Denver Newspaper Agency were the least detailed of any of the Victims.  While the other Victims had detailed invoices (which at least listed the number of items received, even if not the type) about 70% of the time, Denver

26

Newspaper Agency only had detailed invoices about 10% of the time.  (ECF No. 311-1 at 20.)  The Expert Report extrapolated the total number of items handled by the company, at least in part, from however many detailed invoices existed for each customer.  Because there were so few detailed invoices for Denver Newspaper Agency, the Court finds that the calculation regarding the percentage of CRT monitors to total items was based on an insignificant sample size, a fact which affects the reliability of the extrapolation.  Additionally, the Court notes that between 31% and 35% of the items handled by Defendants for all of the other Victims were CRT monitors.  Denver Newspaper Agency's ratio of only 16% of the total items being CRT monitors is an obvious outlier.

Given the small number of detailed invoices for Denver Newspaper Agency and the fact that the Export Reports extrapolation from this sample size results in a statistical outlier, the Court finds that it is more reliable to average the percentages of CRT monitors from the other Victims and use this average to calculate the monies paid by Denver Newspaper Agency for CRT monitor disposal.  Multiplying 33% (the average of the other Victims' percentages) by the total amount paid by Denver Newspaper Agency ($40,625) shows that Denver Newspaper Agency paid Defendants $13,406 for CRT handling and disposal.  Thus, the value of the legitimate services rendered to Denver Newspaper Agency by Defendants was $27,219 and the actual loss to Denver Newspaper Agency was $13,406.

3.    Conclusion

The PSIRs have a total loss amount of $403,790.22, which results in a 14 level enhancement pursuant to § 2B1.1(b)(1).  For the reasons set forth above, the Court has

concluded that the amounts paid by ADT are not relevant conduct and should not be included in the total loss amount. The Court has also concluded that Defendants are entitled to an offset for the value of the legitimate services they provided to the Victims. Given these rulings, the Court finds that the amount of loss for each Victim is as follows:

| | |
|---|---|
| Jefferson County | $57,748 |
| City of Boulder | $2,065 |
| El Paso County | $8,079 |
| Summit County | $5,740 |
| City and County of Broomfield | $642 |
| Denver Newspaper Agency | $13,406 |
| **TOTAL** | **$87,680** |

The Court therefore arrives at a total actual loss amount of $87,680 to the six identified entities set forth above. Pursuant to § 2B1.1(b)(1), this loss amount results in an 8 level enhancement to the offense level.

**B.     Restitution**

The PSIRs recommend that the Court order restitution to ADT, City of Boulder, City and County of Broomfield, Denver Newspaper Agency, El Paso County, Jefferson County, and Summit County in a total amount of $403,790.22. Defendants object to this recommendation.

In ordering restitution, the Court must consider "the amount of loss sustained by a victim as a result of the offense." 18 U.S.C. § 3663(a). "Thus, unlike the sentencing

guidelines, which allow a court to consider actual or intended loss for the purposes of sentencing, . . . section 3663 implicitly requires that an award of restitution be based on the amount of loss actually caused by the defendant's offense." *United States v. Messner*, 107 F.3d 1448, 1455 (10th Cir. 1997); *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001) ("An award of restitution must be based on the amount of loss actually caused by the defendant's conduct.").

The Court's finding as to the amount of actual loss to each Victim is set forth above.  In accordance with that ruling, the Court finds that the Victims are entitled to restitution in the following amounts:

| | |
|---|---|
| Jefferson County | $57,748 |
| City of Boulder | $2,065 |
| El Paso County | $8,079 |
| Summit County | $5,740 |
| City and County of Broomfield | $642 |
| Denver Newspaper Agency | $13,406 |

Additionally, the Court "may make each defendant liable for payment of the full amount" of restitution, or alternatively may "apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."  18 U.S.C. § 3664(h).  The evidence in this case showed that Defendant Richter was the president and sole shareholder of Executive Recycling while Defendant Olson was a salaried employee who did not profit from the fraudulent conduct in any significant way.  Because the Defendants did not benefit equally from the fraud, the Court finds that apportionment is appropriate in this case.

Pursuant to the Mandatory Victims Restitution Act, the Court will ensure that each customer listed above receives a restitution award for the full amount of loss it suffered, but each Defendants' share of that restitution judgment may not be equal.  At the time of each Defendants' individualized sentencing hearing, the Court will apportion restitution between the Defendants based on his or its relative contribution to the loss, the relative amounts by which each Defendant profited on account of his or its criminal activity, and each Defendant's individual economic circumstances.

## C.    Forfeiture

The Government has filed a "Motion for Preliminary Orders of Forfeiture for Personal Money Judgments Against Defendants Executive Recycling, Inc., Brandon Richter, and Tor Olson."  (ECF No. 350.)  Criminal forfeiture is governed by Federal Rule of Criminal Procedure 32.2, which sets forth four requirements before a final order of forfeiture can be entered.  The first step in the forfeiture process is notice.  Fed. R. Crim. P. 32.2(a) ("A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek forfeiture of property as part of any sentence.").  The Indictment in this case contained the following Forfeiture Allegation:

> 47.    The allegations contained in Counts One through Fifteen of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), Title 18, United States Code, Section 1956(c)(7), and Title 28, United States Code, Section 2461(c).

> 48.    Upon conviction of the violations alleged in Counts One through Fifteen of this Indictment involving violations of Title 18, United States Code, Sections 1341 and 1343, Title

42, United States Code, Sections 6928(d)(4), and Title 18,
United States Code, Section 554, the defendants ER,
BRANDON RICHTER, and TOR OLSON shall forfeit to the
United States, pursuant to Title 18, United States Code,
Section 981(a)(1)(C), and Title 28, United States Code,
Section 2461(c) any and all of the defendants' right, title and
interest in all property constituting and derived from any
proceeds the defendants obtained directly and indirectly as
a result of such offense, including, but not limited to a money
judgment in the amount of proceeds obtained by the scheme
and by the defendants as a result of the offenses, for which
the defendants are joint and severally liable.

49.    If any of the property described in the paragraphs
above, as a result of any act or omission of the defendants:
  a)    cannot be located upon the exercise of due
        diligence;
  b)    has been transferred or sold to, or deposited
        with, a third party;
  c)    has been placed beyond the jurisdiction of the
        Court;
  d)    has been substantially diminished in value; or
  e)    has been commingled with other property
        which cannot be subdivided without difficulty;
it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), incorporated by Title
28, United States Code, Section 2461(c), to seek forfeiture
of any other property of said defendants up to the value of
the forfeitable property.

(ECF No. 1 at 14-16.)  Thus, the Court finds that the Government has provided notice

and satisfied Rule 32.2(a).

The instant Motion is directed towards the second step in the forfeiture process

in that it asks the Court to enter a preliminary order of forfeiture against all Defendants

jointly and severally in the amount of $2,533,762.51.  (ECF No. 350.)  Where, as here,

a money judgment is sought, the preliminary order of forfeiture must set forth the

amount of the money judgment.  Fed. R. Crim. P. 32.2(b)(2)(A).  The preliminary order

of forfeiture should be entered "sufficiently in advance of sentencing to allow the parties

to suggest revisions or modifications before the order becomes final." Fed. R. Crim. P. 32.2(b)(2)(B).

The Court notes that Defendant Olson has requested a hearing on forfeiture and, pursuant to Federal Rule of Criminal Procedure 32.2(b)(1)(B), the Court must conduct a hearing if one is so requested. However, there is no requirement that the hearing be held before a preliminary order of forfeiture is entered. Having reviewed the issues set forth in the Motion and the Defendants' oppositions thereto, the Court finds it will better serve the scarce interest of judicial resources to resolve a number of the legal issues raised therein and enter the preliminary order of forfeiture based on these rulings. If, after reviewing the preliminary order of forfeiture, Defendant Olson[4] persists in his request for a hearing on forfeiture, the Court will set one in advance of Defendant Olson's individualized sentencing hearing. In the Court's view, given the surfeit of briefing and argument it has already reviewed from the parties on this issue, there is little to nothing to be gained from holding such a hearing—but will schedule one should Defendant Olson continue to insist that such a hearing be held.

Defendants do not object to the fact that some amount of forfeiture is required based on the jury's verdict. However, they argue vehemently that the amount of forfeiture requested by the Government is excessive. Section 981(a)(1)(C) of Title 18 provides that all "proceeds" traceable to the unlawful activity in this case are subject to forfeiture. The parties dispute the appropriate definition of "proceeds" in this section. The Government contends that proceeds are generally "property that a person would

---

[4] The Court notes that neither Executive Recycling nor Brandon Richter requested a hearing on forfeiture.

not have but for the criminal offense" and, therefore, all of Defendants proceeds are subject to forfeiture.  (ECF No. 350 at 7 (quoting *United States v. Yass*, 636 F. Supp. 2d 1177, 1184 (D. Kan. 2009).)  Defendants argue that the Court should apply the more narrow defintion set forth in § 981(a)(2)(B), which provides: "In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term 'proceeds' means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the good or services."  (ECF Nos. 355 at 4-5, 356 at 2-3.)

The Court concludes that the definition of proceeds applicable here is that set forth in § 981(a)(2)(B).  The predicate act underlying Defendants' convictions— electronics recycling—is not inherently unlawful.  There are a multitude of legitimate electronics recyclers that operate within the confines of state and federal law.  Even the exportation of used electronic materials is not *per se* unlawful; it simply requires certain documentation.  What made Defendants' actions unlawful was the manner in which Defendants did business, *i.e.*, by misrepresenting to customers where and how their electronic materials would be handled and failing to obtain the required export documentation.  Because the criminal acts here involved the provision of lawful services in an unlawful manner, the Court concludes that the appropriate definition of "proceeds" is "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services."  18 U.S.C. § 981(a)(2)(B); *United States v. Nacchio*, 573 F.3d 1062, 1089 (10th Cir. 2009) (applying § 981(a)(2)(B)'s definition of proceeds to an insider trading case).

Having determined the applicable definition of "proceeds", the Court must

33

consider whether the Government has met its burden of establishing the amount of the criminal forfeiture money judgment by preponderance of the evidence. *United States v. Bader*, 678 F.3d 858, 893 (10th Cir. 2012).  Defendants argue that the Government cannot meet this burden with respect to the full amount of forfeiture requested because it cannot show that the proceeds of their illegal activity was $2,533,762.51.  Specifically, Defendants argue that they were only convicted of certain fraudulent transactions, not a wide ranging scheme to defraud, and there is no evidence that they acquired anywhere near $2,533,762.51 as a result of these illegal transactions.  (ECF Nos. 355 at 2-3, 356 at 5-13.)

The Government's requested forfeiture amount is the sum of:  (1) the monies paid to Executive Recycling by the nine customers named in the Indictment and Summit County, and (2) the monies paid to Executive Recycling by various foreign buyers.  For the same reasons the Court did not include the monies paid by Centura Health, Cherry Creek Schools, Children's Hospital, and ADT in the loss amount set forth in Part A above, it will not include these monies in the forfeiture award.  Specifically, the Court finds that the Government has not met its burden of showing by a preponderance of the evidence that the monies paid to Defendants by Centura Health, Cherry Creek Schools, Children's Hospital, and ADT were "acquired through illegal transactions."  *See* 18 U.S.C. § 981(a)(2)(B).  Therefore, the Court finds that these monies are not "proceeds" subject to forfeiture.

Next, the Court finds that only a portion of the monies paid to Defendants by Jefferson County, City of Boulder, El Paso County, Summit County, City and County of Broomfield, and Denver Newspaper Agency constitutes proceeds of illegal conduct.  As

set forth above in the loss calculation, a significant portion of the monies paid by these customers was for legitimate services provided by Defendants in the manner promised. The monies paid for these legitimate services were not "acquired through illegal conduct" and therefore are not "proceeds" subject to forfeiture.  For the same reasons set forth in the loss analysis above, the Court finds that the victims of the Defendants' fraud paid $87,680 to Defendants for processing and handling CRT monitors, which was the backbone of the illegal conduct.  Thus, the Court finds that $87,680 constitutes "proceeds" of the fraud convictions.

The Government's proposed forfeiture amount also includes monies paid to Executive Recycling by overseas brokers in the amount of $2,058,469.19.  (ECF No. 350 at 11.)  The Government contends that this amount should be included in the forfeiture because "[t]here is no evidence in the record that any customer who was paying for Executive Recycling's services in the United States was told that their e-waste was being exported or sold in China."  (*Id*.)  While the Court does not disagree with the Government's statement, the fact that no customers were explicitly told their e-waste was being sold overseas does not mean that all of the transactions involving these customers were illegal.  As discussed above in the Court's analysis of whether Defendants' actions towards ADT were relevant conduct, in order to find that Defendants' actions towards a particular customer were criminal, the Court must find that the misrepresentations were material to that customer.  (ECF No. 271-7 at 39-42.) On the record before it, the Court cannot find that Defendants' representations regarding the domestic handling of e-waste were material to any of the customers other than those charged in the Indictment.

Moreover, the jury did not find that the overseas brokers were part of the criminal scheme to defraud Defendants' customers.  Transactions between Defendants and two of the overseas brokers—Hong Tong Trading and Jet Ocean Technology—were the subject of Counts 3 and 4 of the Indictment.  (ECF No. 1 at 7-8.)  Defendants were acquitted on both of these Counts.  (ECF Nos. 271-11, 271-12 & 271-13.)  Had the jury found that the criminal scheme to defraud encompassed the monies paid by these overseas brokers, it could have convicted Defendants on these Counts.

The Court acknowledges that, in many cases, the amount of money subject to forfeiture would be different from, and significantly higher than, the amount of loss for purposes of § 2B1.1(b)(1) or the amount ordered for restitution.  *See United States v. McGinty*, 610 F.3d 1242, 1247 (10th Cir. 2010) ("Moreover, restitution and forfeiture will not necessarily be in the same amount because 'restitution is calculated based on the victim's loss, while forfeiture is based on the offender's gain.'") (quoting *United States v. Webber*, 536 F.3d 584, 602-03 (7th Cir. 2008)).  However, in this case, the Court is unable to meaningfully draw such a distinction.  Many of the cases cited by the Government involve a defendant who pled guilty to one narrow offense but, in doing so, admitted that an entire business model was fraudulent.  *See United States v. Budden*, 2012 WL 1315366, *5 (D.S.C. April 17, 2012) (defendant pled guilty to one count of mail fraud but Court found that entire amount gained by business was proceeds of the same scheme and therefore subject to forfeiture).  Other cases involve convictions on broad fraudulent schemes in which all monies obtained by the defendant are proceeds of the scheme.  *See United States v. Boesen*, 473 F. Supp. 2d 932 (S.D. Iowa 2007)

36

(court ordered forfeiture of all proceeds from 900 health care transactions even though not all were indicted because they all involved the same fraudulent scheme).

As opposed to those cases, Defendants here were convicted on only a portion of the fraud counts which shows—as discussed in greater detail above—that the jury found that certain business dealings were criminal while others were not.  Given this mixed verdict, the Court cannot conclude that all of the monies Defendants received from the overseas buyers were proceeds of the illegal activity.  Had the Government attempted to link any portion of the payments from overseas brokers to the CRTs provided by Jefferson County, the City of Boulder, El Paso County, Summit County, the City and County of Broomfield or Denver Newspaper Agency, the Court would have added that amount to the forfeiture because it could have found that these amounts were proceeds of illegal activity.  However, on the record before the Court, any attempt to apportion the monies paid by the overseas brokers between the electronic materials provided by the Victims and those provided by other customers would be pure speculation.  Because the Government bears the burden of establishing the amount of proceeds traceable to the criminal conduct, the lack of evidence on this point is to its detriment and the Court cannot conclude that any portion of the payments from the overseas brokers are proceeds of the fraud convictions.

With respect to Defendants' conviction on Count 15 of the Indictment, the Court has no doubt that some overseas broker paid for the GATU shipment which was the subject of that offense.  However, the instant Motion does not put forth any evidence of the amount paid by that overseas shipper for the GATU shipment and the Court will not parse the trial record to attempt to discern that amount. Therefore, the Court finds that

the record currently before the Court is insufficient to permit it to find that any portion of the payments made by the overseas brokers were "proceeds" of the Defendants' smuggling conviction.

Accordingly, the Court finds that the "amount of money acquired through the illegal transactions resulting in the forfeiture" is $87,680.[5]  Per § 981(a)(2)(B), Defendants are entitled to have this amount offset by "the direct costs incurred in providing the goods or services."  If Defendant Olson persists in his request for a hearing, the Court will set one for the purpose of allowing him to attempt to meet his burden of establishing the amount of Defendants' direct costs in providing the service.  However, the Court notes that, at the evidentiary hearing on the amount of loss, there was no evidence presented regarding Defendants' costs to process or handle the CRT monitors and, given the shoddy record-keeping engaged in by Defendants, Defendant Olson will have an uphill battle to meet his burden.  Nonetheless, Rule 32.2(b)(1)(B) provides that Defendant Olson has a right to hearing if he so requests and the Court will abide by that rule.  Therefore, Defendant Olson shall notify the Court not later than June 19, 2013 as to whether he requests a hearing on the amount of the forfeiture judgment.  In the interim, in accordance with Federal Rule of Criminal Procedure 32.2(b)(2), the Court will enter a preliminary order of forfeiture in the amount of $87,680.

---

[5]  One of the arguments made by Defendant Richter in opposition to the Government's Motion for Preliminary Order of Forfeiture is that the nearly $2.5 million requested by the Government violates the Eighth Amendment as an excessive fine.  (ECF No. 355 at 7.)  As the Court has concluded that the appropriate forfeiture amount is only $87,680, the Court deems this argument moot.

Having disposed of all issues related to the amount of loss for purposes of §

2B1.1(b)(1), restitution, and the preliminary order of forfeiture, the Court will next

address the specific objections made to other aspects of the PSIRs.

**B.      Number of Victims for Purposes of U.S.S.G. § 2B1.1( b)(2)**

In the Government's Sentencing Statement, it argues that the Court should

assess a two-level enhancement pursuant to U.S.S.G. § 2B1.1(2)(A)(i) because the

offense involved ten or more victims.  (ECF No. 304 at 20.)  The PSIRs do not include

this enhancement.  (ECF Nos. 307, 308 & 312.)  The Government's objection to the

PSIRs does not mention the failure to include the enhancement for number of victims.

However, at the post-trial evidentiary hearing, the Government introduced evidence

from three other former customers of Executive Recycling.  The only conceivable

purpose for this evidence is an attempt to meet the Government's burden of showing

the existence of ten or more victims for purposes of the two level enhancement.

According to the U.S.S.G. § 2B1.1, cmt. n.1, a "victim" is any person "who

sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G. §

2B1.1, cmt. n.1.  As set forth in Part A.2.d above, the Court has included six victims in

its loss calculation:  the five customers named in the Counts of the Indictment on which

the Defendants were convicted, and Summit County based on the Court's finding on

relevant conduct.  The Court has found in Part A.1 above that the Government did not

meet its burden of showing that Defendants' conduct towards any of the other

customers was criminal and, therefore, the Court did not consider these customers as

relevant conduct.[6]   Thus, to the extent the Government has objected to the PSIRs'

failure to apply a two level enhancement for the number of victims pursuant to U.S.S.G.

§ 2B1.1(b)(2), such objection is OVERRULED.

## C.    Acceptance of Responsibility

Defendants' PSIRs find that the two point reduction for acceptance of

responsibility pursuant to U.S.S.C. § 3E1.1 is not applicable in this case.  (ECF Nos.

307-308 & 312.)  Each Defendant objects to this finding.  (ECF Nos. 317-19.)

U.S.S.G. § 3E1.1[7] provides:  "If the defendant clearly demonstrates acceptance

of responsibility for his offense, decrease the offense level by 2 levels."  One of the

factors the Court is to consider in determining whether to award this two level reduction

is whether the defendant has "truthfully admitt[ed] the conduct comprising the

offense(s) of conviction, and truthfully admitt[ed] or not falsely den[ied] any additional

relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant

Conduct)."  U.S.S.G. § 3E1.1 cmt. n.1.

---

[6]  The Court also notes that at least two of the customers, Millennium Recycling and Janus, had "no cost" arrangements with Executive Recycling, meaning these entities did not pay Executive Recycling for their services.  Therefore, even if the Court had found that Defendants' actions towards them were relevant conduct, these entities could not be counted as victims for purposes of § 2B1.1(2)(A)(i).  *See United States v. Leach*, 417 F.3d 1099, 1106-07 (10th Cir. 2005) (district court erred by including customers that did not suffer any actual loss as "victims" for purposes of § 2B1.1(2)).

[7]  Because Executive Recycling is a corporation, the relevant guideline for determining whether to reduce the offense level for acceptance of responsibility is § 8C2.5.  Section 8C2.5 provides that a corporation is entitled to a two level reduction only if "the organization cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct."  Because this standard is essentially the same as § 3E1.1 and Executive Recycling was acting through Brandon Richter and Tor Olson, the Court finds that it need not separately analyze whether Executive Recycling was entitled to a reduction for acceptance of responsibility.

Acceptance of responsibility does not typically apply to a defendant who puts the government to its burden of proof at trial. *Id*. at cmt. 1 n.2.  However, exercising one's right to trial does not preclude a defendant from consideration for such the acceptance of responsibility reduction. *Id*.  "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id*.

Defendants contend that they are entitled to the two point reduction for acceptance of responsibility because they admitted factual guilt and defended the charges brought against them "on the grounds that the conduct at issue did not fall within the scope of the statutes serving as the foundation for the charges."  (ECF No. 298 at 34.)  Specifically, Defendants asserted that the fraud counts involved a denial of honest services and that the Government's theory of the case violated Defendants' Due Process rights by enlarging the scope of the statutes after the criminal activity occurred. (*Id*.; ECF No. 317 at 6-7.)

The Court presided over all pre-trial matters and the extended jury trial of this matter.  As such, it has a solid grasp of the defenses raised in this case and whether Defendants should be afforded the acceptance of responsibility reduction. *See* U.S.S.G. § 3E1.1 cmt. n.5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.  For this reason, the determination of the

sentencing judge is entitled to great deference on review."). The Court finds that Defendants are engaging in some revisionist history in arguing that they are entitled to the acceptance of responsibility reduction. While Defendants certainly raised a number of legal issues both before and during trial, including honest services, Due Process, and application of the Universal Waste laws, these were not the only defenses they raised. Defendants did not admit the facts applicable to this case. Most obviously, Defendants did not admit any facts relevant to the obstruction of justice charge. The Government's evidence on this count was vastly different than the Defendants' testimony. Additionally, with respect to the fraud and the exportation counts, Defendants contested much of the evidence of the Government's witnesses through cross-examination of those witnesses, by calling their own witnesses, and through their own testimony. The contention that Defendants admitted factual guilt and went to trial solely to pursue their legal arguments significantly misrepresents the record.

The Tenth Circuit has held that "acceptance of responsibility adjustments after trial are very rare." *United States v. Sims*, 428 F.3d 945, 961 (10th Cir. 2005). In fact, the Tenth Circuit has affirmed only one case in which the district gave the two level reduction for acceptance of responsibility when a defendant took the case to trial, *see United States v. Gauvin*, 173 F.3d 798 (10th Cir. 1999), and has frequently found that the district court's award of this reduction in these circumstances was clear error. *See, e.g., United States v. Tom*, 494 F.3d 1277, 1281 (10th Cir. 2007).

Most relevant to this case, the Tenth Circuit has explicitly held that the acceptance of responsibility reduction is not appropriate where a defendant goes to trial

42

to force the government to prove the intent element of the crime. *United States v. Salazar-Samaniega*, 361 F.3d 1271, 1281 (10th Cir. 2004) (denial of intent to distribute is denial of a key factual element of the crime).  In this case, Defendants disputed whether they acted with intent to defraud and whether they knowingly failed to file the required exportation documentation.  The Defendants therefore contested the *mens rea* with respect to the charges brought against them.  As such, pursuant to *Salazar-Samaniega* and other similar cases, the Court cannot say that Defendants are entitled to a reduction for acceptance of responsibility.

Accordingly, Defendants' objections to the failure to award them a two level reduction for acceptance of responsibility in accordance with U.S.S.G. § 3E1.1 are OVERRULED.

**D.     Organizer/Leader Enhancement**

The PSIR attributes a two level enhancement to Defendants Richter and Olson as leaders and organizers of the criminal activity pursuant to U.S.S.G. § 3B1.1.  Section 3B1.1 provides:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a)      If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b)      If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
>
> (c)      If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in

(a) or (b), increase by 2 levels.

(ECF Nos. 308 ¶ 60; 312 ¶ 67.)  This enhancement is objected to by both Richter and Olson; the Government has also filed an objection.  (ECF Nos. 318-19 & 345.)

      1.   <u>The Government's Objection</u>

The Government argues that Richter and Olson should have been assessed the four level enhancement because their criminal activity was "otherwise extensive" under § 3B1.1(a).  (ECF No. 345 at 2.)  The Government contends that the fraud perpetrated by Defendants "involved multiple participants both knowing, and unknowing, and transactions that occurred both within the United States and all over Asia."  (*Id*.)

"In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."  U.S.S.G. § 3B1.1 cmt. n.3.  The Tenth Circuit has held that "[t]he extensiveness of a criminal activity is not necessarily a function of the precise number of persons, criminally culpable or otherwise, engaged in the activity.  Rather, an inquiring court must examine the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme."  *United States v. Yarnell*, 129 F.3d 1127, 1139 (10th Cir. 1997).

Having considered the totality of the circumstances, the Court finds that the criminal activity here was not "otherwise extensive".  The criminal activity essentially involved misrepresentations to local customers about Executive Recycling's business practices.  Executive Recycling was a relatively small enterprise with only two individuals who knowingly perpetrated the fraud charged in this case.  While the fraud

44

certainly involved a number of unknowing participants in that Executive Recycling had employees who loaded the electronic materials into shipping containers for exportation overseas, there was no evidence that any of these employees had sufficient knowledge of either the representations Defendants made to the customers or the applicable governing regulations so as to be participants in the fraud.

Additionally, as previously discussed, significant portions of Executive Recycling's business were legitimate.  Executive Recycling picked up electronic waste, destroyed data, shredded hard drives, and resold usable computers and parts in a lawful manner.  Thus, even in the context of Executive Recycling's overall business model, the fraudulent and otherwise illegal business practices engaged in by Defendants were not extensive.

Compared to other cases which have been found to involve "otherwise extensive" criminal activity, the fraud in this case was relatively simple and limited.  *See*, *e.g.*, *United States v. Yarnell*, 129 F.3d 1127, 1139 (10th Cir. 1997) (fraudulent enterprise was extensive when it stretched over four states, created more than 40 victims, and generated losses of more than $140,000); *United States v. Massey*, 48 F.3d 1560 (10th Cir. 1995) (fraudulent scheme was extensive when it had operations in two cities, was advertised in newspaper outlets from Chicago to New York, and attracted clients from all over the country).

For all of these reasons, the Court finds that Defendants' illegal activities were not "otherwise extensive".  The Government's objection to the PSIRs' application of the two level enhancement for Defendants' roles in the offense rather than the four level enhancement is therefore OVERRULED.

45

2.      Richter's Objection

Defendant Richter objects to the assessment of the two level enhancement

against him and argues that Executive Recycling did not constitute any sort of criminal

enterprise.  (ECF No. 318 at 3.)  Defendant Richter contends that the jury's mixed

verdict "proves the jury did not consider ER to be a criminal activity, but rather a

legitimate business that, as to certain specific victims, made fraudulent representations

in order to secure business."  (*Id*.)  Defendant Richter argues that it would be error to

apply this enhancement where the jury failed to find a criminal scheme.  (*Id*.)

The Court disagrees with Defendant Richter's interpretation of the jury's verdict.

Although the Court agrees that the jury did not find a wide ranging scheme to defraud,

Defendants were convicted on half of the fraud counts.  (ECF Nos. 271-15, 271-16 &

271-17.)  To convict Defendants on each of these counts, the jury was required to find

that Defendants devised a criminal scheme to defraud that particular victim.  (ECF No.

271-7 at 39-40.)  The jury was presented with an abundance of evidence showing that

both Defendant Richter and Defendant Olson perpetrated this scheme and that they

made misrepresentations to a number of customers.  On this evidence, the jury

convicted Defendant Richter and Defendant Olson on the same fraud counts.  (ECF

No. 271-16 & 271-17.)  Thus, the Court finds that the jury's mixed verdict on the fraud

counts does not show that the jury failed to find any evidence of a criminal scheme.

Factors that the Court is to consider in determining whether a defendant is an

organizer or a leader for purposes of § 3B1.1 include:

> the exercise of decision making authority, the nature of
> participation in the commission of the offense, the
> recruitment of accomplices, the claimed right to a larger

46

> share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id*. § 3B1.1, cmt. n.4.

Defendant Richter argues that the leader/organizer enhancement should not apply to him because Defendant Olson was in charge of the day-to-day operations at Executive Recycling. (ECF No. 318 at 4.) The fact that Defendant Richter did not exercise day-to-day control over the operations does not take him outside the coverage of this enhancement. To qualify as an organizer, "a defendant need only devise a criminal scheme providing the wherewithal to accomplish the criminal objective, and coordinate and oversee the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." *United States v. Snow*, 663 F.3d 1156, 1163 (10th Cir. 2011) (internal quotation omitted). The evidence at trial showed that Defendant Richter devised Executive Recycling's business plan, was directly involved with soliciting business from the victims (such solicitation involved the misrepresentations at the heart of the fraud counts), and provided the means to accomplish the fraudulent acts.

Finally, Defendant Richter argues that he was not the leader or organizer of the criminal activity; rather, he takes the position that he and Defendant Olson jointly undertook the activity with neither controlling the other. (ECF No. 318 at 4.) The Court again disagrees with this view of the evidence. The evidence showed that Defendant Richter started Executive Recycling, and was the corporation's sole shareholder and president at all relevant times. While Defendant Olson may have run the day-to-day

operations, there was no evidence that he was involved with developing the business model or that he made strategic decisions about the company's business model. Witness after witness testified that, although Defendant Olson ran the day-to-day operations of Executive Recycling, Defendant Richter was in charge of the overall business. Importantly for the Court in this regard, of the two individual Defendants, Richter was the only one who personally profited from the scope and success of that business model (given that Defendant Olson received a fixed salary which was not a function of the amount of ill-gotten proceeds), and he was the only who had access to and controlled the enterprise's bank accounts.

Thus, the Court has little difficulty concluding that Defendant Richter was an organizer of the criminal activity and, therefore, the two level enhancement under § 3B1.1 should apply. Accordingly, the Court OVERRULES Defendant Richter's objection to application of the two level enhancement for role in the offense pursuant to U.S.S.G. § 3B1.1.

3.      Olson's Objection

Tor Olson also objects to application of the two level enhancement for role in the offense. (ECF No. 319 at 9-10.) Defendant Olson argues that he was "a salaried employee who received no additional compensation as a result of the fraudulent conduct" and therefore the enhancement should not apply. (*Id*. at 10.)

Considering the factors in § 3B1.1, the Court finds that Defendant Olson was not a leader or organizer of the criminal activity. There was no evidence that Defendant Olson had authority to make major decisions, such as planning or organizing the business operations. As the only persons criminally liable for the fraud were Defendant

48

Olson and Defendant Richter, with Defendant Richter devising the plan and recruiting Defendant Olson, there was no evidence that Defendant Olson recruited any accomplices.  Rather, the evidence showed that Defendant Olson's role was to run the day-to-day operations and implement the scheme devised by Defendant Richter.[8] Additionally, Defendant Olson was a salaried employee who did not benefit financially from the fraudulent activities.  *Compare Snow*, 663 F.3d at 1163 (defendant was "organizer" of the scheme where he had a heightened degree of participation in planning the offense, decision-making authority, and provided the knowledge and capital to perpetrate the fraud).

The Commentary to § 3B1.1 states that it is "included primarily because of concerns about relative responsibility."  The Court finds that Defendant Olson's responsibility for the fraudulent activity is relatively less than Defendant Richter's.  As the Court has applied the two level enhancement to Defendant Richter, the Court finds that the purpose of § 3B1.1's enhancement for his role in the offense is not achieved if the Court applies this enhancement to Defendant Olson.  Therefore, Defendant Olson's objection to application of the two level enhancement pursuant to U.S.S.G. § 3B1.1 is SUSTAINED.

## E.     Sophisticated Means

The PSIR for each of the Defendants applies a two level enhancement for fraud

---

[8]  The Court does not mean to imply that Defendant Olson did not have any decision-making authority or any role in planning or organizing the criminal activity.  The Court's finding is that Defendant Olson's role was significantly less than Defendant Richter's, especially with respect to devising the scheme rather than implementing it.  There was certainly no evidence that Defendant Olson was the mastermind behind the fraud.

perpetrated by "sophisticated means" pursuant to U.S.S.G. § 2B1.1(b)(10)(C).  (ECF Nos. 307-08 & 312.)  All Defendants object to this enhancement.  (ECF Nos. 317-19.)

Section 2B1.1(b)(10)(C) provides that, "[i]f the offense involves sophisticated means, increase by 2 levels."  Application Note 8 provides, "[f]or the purposes of subsection (b)(2), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense . . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."  U.S.S.G. § 2B1.1, cmt. n.8(B).

In recommending application of this enhancement, the PSIR relies on the fact that Defendants utilized mass mailings and a publicly-available website for purposes of attracting customers.  (*E.g.*, ECF No. 308 at 17.)  However, the Court finds that the use of mass mailings hardly makes the fraudulent conduct sophisticated.  If anything, mass mailings are inherently unsophisticated in the digital age.  Along the same lines, if the Court were to find that the use of a website—particularly one as rudimentary as Executive Recycling's website—constituted "sophisticated means", then the enhancement would apply in nearly every fraud case, which surely could not have been the Sentencing Commission's intent when it adopted this enhancement guideline.  The Court agrees with Defendants that the mass mailings and website are more appropriately considered under the mass-marketing enhancement discussed below.

The PSIRs also state that Defendants "completed paperwork to guarantee the e-waste products cleared customs."  (*E.g.*, ECF No. 308 at 17.)  This statement is not factually accurate.  There was no evidence that either Defendant Richter or Olson was

50

involved with completing any export paperwork; rather, the evidence showed that this paperwork was completed by the freight forwarders or the shippers.  Therefore, the Court does not find that this warrants application of the enhancement.

Finally, the PSIRs point to evidence of e-mails exchanged between Defendants and the overseas brokers about how to hide computer monitors so they would not be detected by foreign customs officials.  (*E.g.*, ECF No. 308 at 17.)  While this is an accurate recitation of the evidence, in the context of the overall fraudulent scheme, the Court finds that this evidence falls short of warranting application of the sophisticated means enhancement.  The Court finds that the fraud perpetrated here was relatively simple.  Defendants made promises about handling materials domestically and in an environmentally responsible manner and, instead of living up to these promises, they shipped the materials overseas with little idea of or control over where they would end up or how they would be handled.  The solicitation of the Victims mainly involved face-to-face sales with Defendants providing pamphlets and referring Victims to Executive Recycling's website for additional information about their services.   Moreover, the e-mails discussed above were the only evidence showing that Defendants attempted to hide anything about their fraud.  There was ample testimony at trial that export shipping containers were regularly placed at Executive Recycling's facilities in an area viewable by the public, that customers were invited to tour the facilities or drop by uninvited, and that the shippers (though not the customers) were told that the shipping containers were destined for overseas locations.  There was no evidence of hidden transactions, false entities, corporate shenanigans, or offshore financials.  On these facts, the Court finds that the fraud involved here was not "especially complex or especially intricate" so

as to warrant application of the sophisticated means enhancement. *See United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010); *United States v. Niemoeller*, 2005 WL 1799456, *3 (S.D. Ind. July 15, 2005) (refusing to apply sophisticated means enhancement when defendant conducted his business in the open even though portions of it were illegal).

Accordingly, Defendants' objections to the application of the sophisticated means enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C) are SUSTAINED.

## F.    Mass Marketing

The PSIRs apply a two level enhancement to the offense level for each of the Defendants pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(ii).  (ECF Nos. 307-08 & 312.) Section 2B1.1(b)(2)(A)(ii) provides that a two level enhancement should be applied when an offense "was committed through mass marketing".  The Commentary to this rule provides:

> For purposes of subsection (b)(2), "mass-marketing" means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit. "Mass-marketing" includes, for example, a telemarketing campaign that solicits a large number of individuals to purchase fraudulent life insurance policies.

U.S.S.G. § 2b1.1 cmt. n.4(A).

The PSIRs recommend application of this enhancement because Defendants advertised their services through a website, which had the potential to reach a large number of consumers.  (*E.g.,* ECF No. 308 at 17.)  The PSIRs also find that

Defendants utilized e-mails, advertisements, flow charts and other literature, which were distributed via mass marketing, to promote and explain their business model.  (*Id*.)

Defendants object to application of this enhancement and argue that their website only conveyed information and did not "solicit" customers.  (ECF No. 319 at 3-4.)  Defendants contend that there was "very little evidence" showing that they sent mass marketing materials to customers or that such materials were relied on by the customers.  (*Id*.)

There is little precedent on the proper application of this enhancement.  However, interpreting a similar guideline provision, the Eighth Circuit in *United States v. Hanny*, 509 F.3d 916 (8th Cir. 2007), addressed whether and to what extent a website qualifies as mass marketing.  The website in that case permitted customers to "actively shop for, select, and purchase" the illegal products and, based on this interactivity, the court held that the website satisfied the mass marketing enhancement.  *Id*. at 920.  Pertinent to this case, however, the Eighth Circuit held that "the mere use of a website is not sufficient to trigger this enhancement"; it was only the interactive nature of the website which showed that it was being used to "solicit" customers for the illegal scheme.  *Id*.

Having reviewed the Guidelines, Commentary, and the relevant case law, the Court concludes that the mass marketing enhancement does not apply here.  While Defendants maintained a public website, the purpose of that website was to convey information about their business, including the legitimate aspects of their business.  The only interactive part of the website was a button that permitted the user to contact

Executive Recycling.  The evidence at trial showed that Defendants' business relationships were primarily generated through face-to-face contacts, industry conferences, and personal outreach.  The website facilitated these engagements in the sense that it was a reference point for customers, but customers could not engage Defendants' services directly through the website.  Thus, the Court finds that the Defendants did not use mass marketing to "solicit" customers and that the fraud here was not "committed through" mass marketing.  *Compare United States v. Feldman*, 647 F.3d 450 (2d Cir. 2011) (applying enhancement where defendant set up website to solicit customers to "purchase" an organ in another country when he had no power to arrange the transplant); *United States v. Pirello*, 255 F.3d 728 (9th Cir. 2001) (enhancement applied when defendant's contact with all of his victims originated through online advertisements).

Accordingly, Defendants' objections to the application of the mass marketing enhancement are SUSTAINED.

**G.    Use of Guideline 2Q1.2**

The PSIRs utilize U.S.S.G. § 2Q1.2 to determine the offense level for Defendants' convictions on Count 15 of the Indictment.  (ECF No. 312 at 20.) Defendant Olson objects to the use of this guideline and contends that the appropriate guideline is § 2Q2.1.[9]  (ECF No. 319 at 11.)

In determining the offense level, the Court must first determine which guideline

---

[9]  Defendants Richter and Executive Recycling do not object to the use of § 2Q1.2 and, therefore, the Court has not considered how application thereof would potentially affect their guideline ranges.

section is "applicable to the offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment or information of which the defendant was convicted)." U.S.S.G. § 1B1.2(a).  To do this, the Court must refer to Appendix A of the Guidelines Manual, which sets forth the criminal statutes and recommends particular guidelines for each.  *See* U.S.S.G. § 1B1.2 & app. A.  If Appendix A lists more than one guideline for a criminal statute, the Court must "determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted."  U.S.S.G. § 1B1.2, cmt. n.1.

Count 15 of the Indictment charged:

> 45.    Between on or about March 13, 2008, and April 5, 2008, in the State and District of Colorado and elsewhere, the defendants ER, BRANDON RICHTER, and TOR OLSON knowingly and fraudulently facilitated the transportation, concealment and sale of merchandise, articles, and objects, to wit, CRTs, prior to exportation, knowing that such CRTs were intended for exportation contrary to any law and regulation of the United States, specifically, 42 U.S.C. § 6928(d)(4) and 42 U.S.C. § 6928(d)(6).
> All in violation of the Title 18, United States Code, Section 554.

(ECF No. 1 at 13.)  Per Appendix A of the Guidelines Manual, the guidelines applicable to a conviction for 18 U.S.C. § 554 are §§ 2B1.5, 2M5.2, and 2Q2.1.  The guideline applicable to 42 U.S.C. § 6928(d) is § 2Q1.2.  U.S.S.G. app. A.

The PSIRs have taken the position that "Count 15 sets forth a violation of 18 U.S.C. § 5[5]4[10] and 42 U.S.C. § 6928(d)(4) and (6)."  Based on this understanding of

---

[10]  The Court presumes that the Probation Officer mistakenly referred to § 544 in her Addendum to the PSIR.  (ECF No. 361 at 5. )

the offense of conviction, the PSIRs utilize § 2Q1.2 to determine the offense level for

Count 15.  (ECF No. 312 at 20.)  Application of § 2Q1.2 to Count 15 results in an

offense level of 12 for that Count.  (*Id.*)

Defendant Olson contends that, in Count 15, he was convicted of violating 18

U.S.C. § 554 and that he was not charged in this Count with violating 42 U.S.C. §

6928(d)(4) or (6).  (ECF No. 319 at 11.)  He therefore argues that the Court cannot

apply § 2Q1.2 because it is not listed in Appendix A as applicable to a conviction of 18

U.S.C. § 554.  (*Id.*)  Defendant Olson contends that the Court must choose between

only those guidelines listed for 18 U.S.C. § 554 and that § 2Q2.1 is the most

appropriate guideline for this case.  (*Id.*)  If the Court applies § 2Q2.1, Defendant Olson

argues that his offense level for the conviction on Count 15 would be 6.  (*Id.* at 12.)

The Court finds that it need not decide whether the relevant guideline for Count

15 is § 2Q1.2 or § 2Q2.1, because the resulting overall guideline range is the same for

both.  Section 3D1.4 sets forth how the Court is to determine the combined offense

level where, as here, there is more than one group of offenses.  Section 3D1.4 provides

that "[t]he combined offense level is determined by taking the offense level applicable to

the Group with the highest offense level and increasing that offense level by the amount

indicated in the following table."  The table shows that the overall offense level is

increased by two levels if the difference between the offense levels for the two groups

is four or less.  *See* U.S.S.G. § 3D1.4(a).  The overall offense level is increased by one

level if the difference between the offense levels is between five and eight.  *Id.* §

3D1.4(b).

As applied to this case, the Court finds that, regardless of whether it applies § 2Q1.2 or § 2Q2.1, the resulting overall guideline range is the same.  Given the Court's rulings set forth above, Defendant Olson's offense level for the group of fraud counts is 15 (the base offense level of 7 with an 8 level enhancement pursuant to § 2B1.1(b)(1) for the amount of loss).  If the Court adopts the approach taken in the PSIR and applies § 2Q1.2 to arrive at an offense level of 12 on the smuggling conviction, there is a 3 level difference between the two groups.  This would result in an overall offense level of 17. *See* U.S.S.G. § 3D1.4(a).

As set forth below, the Court finds that Defendant Olson's overall offense level would be the same if it were to apply § 2Q2.1 to Count 15.  Although Defendant Olson argues that the offense level would be 6, his reasoning is flawed.  Specifically, the Court disagrees with Defendant Olson's contention that "[n]one of the specific offense characteristics are applicable".  (ECF No. 319 at 12.)

Section 2Q2.1(b)(3)(A) provides that the Court should increase the offense level based on the "market value of the fish, wildlife, or plants" and, where the market value exceeds $5,000, the Court should increase the offense level by the number of levels from the table in § 2B1.1.  The Court readily admits that there were no fish, wildlife or plants involved in this case.  However, § 2Q2.1 was intended to apply to fish, wildlife or plants that were smuggled out of the country in violation of 18 U.S.C. § 554.  In this case, instead of smuggling fish, wildlife or plants, the goods Defendants were convicted of smuggling were CRT monitors.  If, as Defendant Olson requests, § 2Q2.1 is stretched to apply to the facts of this case, the enhancement based on market value would be driven by the market value of the products smuggled by Defendants, *i.e.* the

CRT monitors.

As set forth in Part A above, the evidence shows that the total market value of the CRT monitors handled by Defendants in this case was $87,680.  The Court acknowledges that Count 15 only involved one overseas shipment which likely had a market value of significantly less than $87,680.  However, the evidence at trial showed that the vast majority of the CRT monitors that Defendants received were shipped overseas without obtaining the consent of the receiving country.  Therefore, the Court can consider the market value of all of the CRTs handled by Defendants as relevant conduct.  *See* U.S.S.G. § 1B1.3.  A market value of $87,680 for the smuggled goods—*i.e.*, the CRT monitors—results in an increase to the offense level of 8 levels. *See* U.S.S.G. § 2Q2.1(b)(3) (where the market value exceeds $5,000, the court should increase offense level in accordance with table in § 2B1.1(b)(1)); § 2B1.1(b)(1) (market value of more than $70,000 but less than $120,000 results in an increase of 8 offense levels).

Adding the 8 level enhancement to § 2Q2.1's offense level of 6 results in an offense level of 14 for the smuggling conviction.  As previously noted, the offense level for the group of fraud counts is 15.  Pursuant to § 3D1.4, the one level difference between these two groups results in the addition of two levels to the higher grouping for a resulting overall offense level of 17—identical to the offense level is § 2Q1.2 is used.

Federal Rule of Criminal Procedure 32(k)(3)(B) provides that the Court need not rule on any disputed portion of a PSIR that does not affect sentencing or which the Court will not consider at sentencing.  While the Court will certainly consider the facts and circumstances underlying Defendant Olson's conviction on Count 15, the Court's

58

sentence will in no way be impacted by whether the relevant guideline section for that offense is § 2Q1.2 or § 2Q2.1.  Therefore, the Court can safely say that the dispute of whether the Court should apply § 2Q1.2 or § 2Q2.1 to Defendant Olson's conviction on Count 15 will not affect sentencing; as a result, it will not be considered by the Court at sentencing.

Accordingly, the Court DECLINES to rule on Defendant Olson's objection to the PSIR's application of § 2Q1.2 to his conviction on Count 15.[11]

## H.    Defendant Olson's Objection to Sentencing Options

Defendant Olson objects to his PSIR's statement that his guideline range is higher than Zone B of the Sentencing Table, which causes him to be ineligible for probation.  (ECF No. 319 at 12.)  This Objection specifically notes that Defendant Olson's ultimate guideline range is dependant on how all of his other objections are resolved.  (*Id.*)  As set forth above, the Court has overruled some of Defendant Olson's objections and sustained others.  Given these rulings, the Court finds that Defendant Olson's offense level is 17 and, with his criminal history category of I, results in a guideline range of 24-30 months.  Per the Sentencing Table, this guideline range is outside of Zone B, thereby making Defendant Olson ineligible for probation.

---

[11]  The Court notes that Defendant Olson filed a Sentencing Statement on February 1, 2013 which argued, amongst other things, that his conviction on Count 15 should be grouped with the fraud convictions.  (ECF No. 298 at 34-35.)  The Probation Department subsequently issued Defendant Olson's PSIR, which does not group the fraud counts and Count 15.  (ECF No. 312.)  In his Objections to the PSIR, Defendant Olson reasserts all of the other arguments raised in his February 2, 2013 Sentencing Statement, but does not re-raise the grouping argument.  (ECF No. 319.)  Because Defendant Olson has not specifically objected to the PSIR's failure to group his conviction on Count 15 with the fraud convictions, the Court considers him to have abandoned this argument.

Accordingly, Defendant Olson's objection to the PSIR's statement that his guideline range is higher than Zone B of the Sentencing Table is OVERRULED.

**I.      Objections to Factual Content of PSIRs**

Defendants object to a variety of factual statements in their respective PSIRs. The Court will address each in turn below.

      1.     <u>Reliance on 60 Minutes Video</u>

All three Defendants object to their respective PSIR's reliance on the segment from 60 Minutes featuring Executive Recycling and toxic waste dumps in Asia. Defendants argue that there was no evidence that any monitor exported by Executive Recycling ended up in the toxic waste dumps featured in the news story.  (ECF No. 317 at 2.)  Defendants have submitted an affidavit from journalist Adam Minter about the flourishing electronics recycling industry in Asia and contend that it is equally likely that the electronic materials exported by Executive Recycling ended up in this trade as in the dumps.  (ECF No. 319-6.)

The Court finds that, as Defendants argue, there is not sufficient information in the 60 Minutes segment that actually links Executive Recycling to the harmful aspects of the Asian electronics industry.  The Court has seen absolutely no evidence that any materials linked with Executive Recycling were located in any dump in Asia.   At trial, because of this lack of evidence and the potential prejudice to Defendants, the Court took pains to admit only those portions of the 60 Minutes video that related directly to Executive Recycling.  At sentencing, the Court will consider only those portions of the 60 Minutes video that were admitted at trial.

Accordingly, Defendants' objections to the consideration of the 60 Minutes video

at sentencing are OVERRULED to the extent they relate to the portions of the video that were admitted at trial, but are SUSTAINED in all other respects.

      2.   <u>Customs Paperwork</u>

In two different places, Defendant Richter's PSIR states that he and Defendant Olson created or completed paperwork to ensure the equipment passed through customs properly.  (ECF No. 308 at 13 & 17.)  Defendant Richter objects to these statements and argues that they are "in direct contradiction to the evidence at trial, which established that ER neither created nor filed such paperwork."  (ECF No. 318 at 2.)

The Court agrees with Defendant Richter.  The evidence at trial showed that the export paperwork was created by an entity other than Executive Recycling.  There was no evidence presented that Defendant Richter or Defendant Olson created any paperwork for the purpose of helping the electronic materials pass through customs.

Accordingly, Defendant Richter's objection to his PSIR's statements about regarding creation of paperwork for customs is SUSTAINED.  Though Defendant Olson has not objected to these statements in his PSIR, the Court will likewise disregard any statements made about him having created export paperwork.

      3.   <u>Defendant Richter's Financial Condition</u>

With respect to Defendant Richter's financial situation, the PSIR states that his current business, LikeNewPCSs, "should be able to sustain itself" if Defendant Richter is sentenced to prison.  (ECF No. 308 at 23.)  This information was allegedly provided to the Probation Officer by Defendant Richter's wife.  (*Id.*)

Defendant Richter objects to this statement and argues that neither LikeNewPCs

nor his other currently operating business, Techcycle, will be sustainable and that they

will both cease operations if he is imprisoned.[12]  (ECF No. 318 at 4-5.)  On the current

record, the Court is unable to discern the continuing viability of Defendant Richter's

businesses if he is sent to prison.  Accordingly, the Court RESERVES RULING on this

objection.  At sentencing, Defendant Richter will be permitted to better develop the

record so that the Court can make the appropriate determination.

4.    Paragraph 151 in Tor Olson's PSIR

Defendant Olson objects to a number of comments contained in paragraph 151

of his PSIR, which states:

> Defendants Richter and Olson ran ER's day to day
> operations.  The defendants advertised that ER would
> dispose of the electronic equipment responsibly and
> domestically.  Additionally, the defendants represented they
> would wipe out and/or shred hard drives in accordance with
> Department of Defense standards.  However, on numerous
> occasions, the defendants failed to complete what they
> advertised and/or what the victim paid for.  Instead, some
> hard drives and equipment were not destroyed but were sold
> in ER's retail store, while other electronics were shipped
> overseas.  Furthermore, the defendants advertised they
> used US based downstream vendors to handle the
> electronics but evidence at trial showed they did not use
> these vendors. The defendants failed to file notifications of
> intent to export the computer monitors nor did they obtain
> consent from the receiving country. The defendants sold
> more than 142,000 monitors overseas, which yielded them a
> gain of more than $1.9 million. There were at least 10
> victims of the offense with a loss of approximately $475,000;
> however, the defendants were acquitted of several counts
> involving some of these victims and loss.

---

[12]  Defendant Richter also objects to the PSIR's statement that Techcycle operates in
both Colorado and Utah.  (ECF No. 317 at 4-5.)  Because the Court will not consider this matter
in determining Defendant Richter's sentence, it need not rule on this issue.  *See* Fed. R. Crim.
P. 32(i)(3)(B).

(ECF No. 312 at 33.)

Defendant Olson first objects to the statement that Defendants failed to complete what they advertised and/or what the victim paid "on numerous occasions" as it relates to data destruction because, at trial, there was only evidence that Defendants failed to provide the contracted-for data destruction once. (ECF No. 319 at 12.) The Court agrees with Defendant Olson's assessment of the evidence but overrules his objection because the statement that Defendants failed to provide the advertised services applies to more than just data destruction. There was more than sufficient evidence at trial to permit the Court to find that Defendants failed to dispose of electronic materials domestically, as they had promised to do, "on numerous occasions". Therefore, Defendant Olson's objection to the PSIR's reference to "numerous occasions" is OVERRULED.

Defendant Olson next objects to the portion of this paragraph which states that "the defendants failed to file notifications of intent to export the computer monitors nor did they obtain consent from the receiving country." (ECF No. 319 at 13.) Defendant Olson argues that he was acquitted on Count 14 and that this was the only count involving the requirement that a notice of intent to export be filed. (Id.) Defendant Olson also objects to the PSIR's use of the plural for "notifications" because he contends that there was only sufficient evidence at trial to permit the Court to find that one shipment left Executive Recycling with broken monitors and therefore required a notification of intent to export be filed. (Id.)

The Court disagrees. While Defendant Olson was acquitted on Count 14, there was sufficient evidence presented at trial to permit the Court to find by a preponderance

63

of the evidence that more than one shipment containing broken CRT monitors left
Executive Recycling's facilities.  Employees of Executive Recycling testified that broken
CRT monitors were routinely loaded into the same type of trailer that was sent
overseas.  There was also evidence from a freight forwarder and shipper about the
number of shipments that went overseas from Executive Recycling's facility.  On this
evidence, the Court finds that the PSIR's statements about the failure to file
notifications of intent to export and/or obtain the consent of the receiving country is well-
supported.  As a consequence, Defendant Olson's objection to these statements is
OVERRULED.

Defendant Olson next objects to paragraph 151's statements that the overseas
sale of computer monitors "yielded [defendants] a gain of more than $1.9 million."  (ECF
No. 319 at 13.)  Defendant Olson contends that he was a salaried employee and that
there was no evidence that he received any significant portion of that financial gain.
(*Id*.)  The Court agrees that this statement improperly lumps Defendant Olson in with
Executive Recycling.   While Executive Recycling may have netted $1.9 million from the
overseas transactions, Defendant Olson was a salaried employee and there is no
evidence that his rate of pay changed with the success of the company.  Therefore,
Defendant Olson's objection to the PSIR's attribution of $1.9 million in profits to him is
SUSTAINED.

Finally, Defendant Olson objects to paragraph 151's statement that there were
"at least 10 victims of the offense with a loss of approximately $475,000."  (ECF No.
319 at 13.)  As discussed above, the Court has made findings as to the amount of loss
and the number of victims involved in this case.  Because the Court's findings differ

from the number of victims and amount of loss set forth in the PSIR, Defendant Olson's objection is SUSTAINED.  The above calculations in Parts A & B regarding the amount of loss and number of victims will govern these aspects of the Court's sentencing for all of the Defendants.

     5.    <u>Financial Risk to Public</u>

Defendant Olson's PSIR states that he "present[s] a financial risk to the public based on his conduct underlying the offense."  (ECF No. 312 at 33.)  Defendant Olson objects to this statement on the basis that he was not motivated by financial gain and, therefore, does not pose a financial risk.  (ECF No. 319 at 14.)  The Court agrees. There was no evidence that Defendant Olson benefitted financially from the criminal conduct and, therefore, the Court does not find that Defendant Olson is a financial risk to the public.  Accordingly, Defendant Olson's objection to paragraph 154 of his PSIR is SUSTAINED.

## III. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    The Government's Objection to the PSIRs' failure to include Cherry Creek School, Centura Health, and Children's Hospital as relevant conduct is OVERRULED;

2.    Defendants' Objections to the inclusion of ADT as relevant conduct are SUSTAINED;

3.    Defendants' Objections to the inclusion of Summit County as relevant conduct are OVERRULED;

4.    Defendants' objections to the PSIRs' loss calculation are OVERRULED in part

and SUSTAINED in part;

5.      The Court FINDS that the amount of loss for purposes of § 2B1.1(b)(1) is

        $87,680, which results in an eight level enhancement to the offense level;

6.      The Court FINDS that the following entities are victims of the Defendants' fraud

        and are therefore entitled to restitution under the Mandatory Victims Restitution

        Act in the following amounts:

        a.      Jefferson County                $57,748

        b.      City of Boulder                  $2,065

        c.      El Paso County                   $8,079

        d.      Summit County                    $5,740

        e.      City and County of Broomfield    $642

        f.      Denver Newspaper Agency          $13,406

7.      The Court FINDS that apportionment of the restitution award is appropriate and

        RESERVES RULING on each Defendants' share of the restitution award until

        the time of the individualized sentencing hearings;

8.      The Government's Motion for Preliminary Orders of Forfeiture for Personal

        Money Judgments against Defendants Executive Recycling, Inc., Brandon

        Richter, and Tor Olson (ECF No. 350) is DENIED in part and GRANTED in part;

9.      The Court ENTERS a Preliminary Order of Forfeiture in the amount of $87,680

        against Executive Recycling, Brandon Richter, and Tor Olson jointly and

        severally;

10.     On or before June 19, 2013, Defendant Olson shall file a notice indicating

        whether, given the Court's ruling on the legal issues related to forfeiture, he

persists in his request for a forfeiture hearing;

11.     To the extent the Government objects to the PSIRs' failure to apply an enhancement pursuant to § 2B1.1(b)(2) based on the number of victims, such Objection is OVERRULED;

12.     Defendants' Objections to the PSIRs' failure to grant them a two point reduction for acceptance of responsibility in accordance with § 3E1.1 are OVERRULED;

13.     The Government's Objection to the PSIRs' application pursuant to § 3B1.1 of the two level enhancement for organizer/leader rather than the four level enhancement is OVERRULED;

14.     Defendant Richter's Objection to his PSIR's application of the two level enhancement for organizer/leader pursuant to § 3B1.1 is OVERRULED;

15.     Defendant Olson's Objection to his PSIR's application of the two level enhancement for organizer/leader pursuant to § 3B1.1 is SUSTAINED;

16.     Defendants' Objections to the PSIRs' application of the two level enhancement for sophisticated means pursuant to § 2B1.1(b)(10)(C) are SUSTAINED;

17.     Defendants' Objections to the PSIRs' application of the two level enhancement for mass marketing pursuant to § 2B1.1(b)(2)(A)(ii) are SUSTAINED;

18.     The Court FINDS that, in accordance with Federal Rule of Criminal Procedure 32(k)(3)(B) it need not rule on Defendant Olson's objection to his PSIR's use of § 2Q1.2 to determine the offense level for his conviction on Count 15;

19.     Defendant Olson's Objection to his PSIR's statement that his guideline range is higher than Zone B of the Sentencing Table is OVERRULED.

20.     Defendants' Objections to the PSIRs' references to the 60 Minutes video are

OVERRULED to the extent they relate to the portions of the video admitted at trial and SUSTAINED in all other respects;

21.   Defendant Richter's Objection to his PSIR's comments about creating and completing customs paperwork is SUSTAINED;

22.   The Court RESERVES RULING on Defendant Richter's Objection to his PSIR's comments about his current financial situation.  At his individualized sentencing, Defendant Richter will have the opportunity to more fully inform the Court about his current financial situation and the viability of his currently operating business if he is sentenced to a term of imprisonment;

23.   Defendant Olson's Objections to Paragraph 151 of his PSIR is OVERRULED in part and SUSTAINED in part;

24.   Defendant Olson's Objection to his PSIR's comment that he presents a financial risk to the public is SUSTAINED;

25.   Individualized sentencing hearings will be set in subsequent Court orders.

Dated this 17th day of June, 2013.

BY THE COURT:

William J. Martinez
United States District Judge